**ANTONIA M. APPS**
**REGIONAL DIRECTOR**
Tejal D. Shah
George N. Stepaniuk
Oren Gleich
Mariel Bronen
Kiran Patel
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
New York Regional Office
100 Pearl Street
Suite 20-100
New York, NY 10004-2616
212-336-0190 (Gleich)
GleichOr@sec.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>-against-<br><br>ALFRED V. TOBIA, JR. and ELIZABETH LEE,<br><br>Defendants. | **COMPLAINT**<br><br>25 Civ. 280<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendants Alfred V. Tobia, Jr. ("Tobia") and Elizabeth Lee ("Lee") (collectively, "Defendants"), alleges as follows:

**SUMMARY**

1. This case concerns insider trading violations by Tobia and his wife's sister Lee. From June 2021 through August 2021 (the "Relevant Period"), Tobia, in his role as an insider of two publicly traded companies, obtained material nonpublic information about potential corporate transactions involving three other publicly traded companies. With that information, Tobia tipped

Lee, who then purchased shares of these three companies in her brokerage account and in an account held by her elderly parents (Tobia's parents-in-law).  Tobia and Lee's insider trading scheme yielded more than $400,000 in unlawful profits.

2. During the Relevant Period, Tobia was the President and Chief Investment Officer of Company A, a publicly traded company, and also sat on its Board of Directors and that of Company B, also a publicly traded company.  Lee is, and was at the time, a self-employed jewelry maker.

3. On June 24, 2021, Tobia had a phone call in his capacity as a Director of Company B with a director ("Director A") of PFSWeb, Inc. ("PFSWeb"), another publicly traded company. During a confidential discussion about a potential transaction between Company B and PFSWeb relating to one of PFSWeb's two business units, Tobia learned from Director A that PFSWeb was in the process of completing a sale of its other business unit, known as LiveArea.

4. Less than an hour after getting off the phone with Director A, Tobia called Lee. Fourteen minutes later, Lee started buying shares of PFSWeb in her elderly parents' account.  Two minutes later, Lee started buying PFSWeb shares in her own account.  In all, Lee purchased over 60,000 shares of PFSWeb in both accounts at a total cost of over $455,000 between Thursday, June 24, and Friday, July 2, 2021.

5. On the morning of the next trading day, Tuesday, July 6, 2021, PFSWeb publicly announced its sale of LiveArea.  The price of PFSWeb stock increased by approximately 43% that day.  Approximately 90 minutes after the announcement, Lee sold all the PFSWeb shares in her account and her parents' account for a total of over $621,000 and reaped a total profit of over $165,000.

6. By mid-July 2021, Company A had engaged in confidential negotiations with Sequans Communications S.A. ("Sequans"), another publicly traded company, about its potential

acquisition by Company A. As President and Chief Investment Officer of Company A, Tobia played a significant role in Company A's efforts to acquire Sequans.

7.      On the morning of July 27, 2021, three weeks after Lee completed her PFSWeb trades, Tobia called Lee. About seven minutes after the call ended, Lee began purchasing shares of Sequans in her parents' account. Lee then made several more purchases of Sequans in her own account that morning. In total that morning, Lee purchased 80,000 shares of Sequans in both accounts at a total cost of approximately $400,000.

8.      Company A and Sequans did not end up reaching an agreement for Company A to acquire Sequans, and there was no public announcement about their discussions. As a result, Lee did not profit from her shares of Sequans based on the material nonpublic information Tobia had given her.

9.      In August 2021, Tobia was involved in discussions at Company A about its making an offer to acquire Spok Holdings Inc. ("Spok"), yet another publicly traded company. On August 11, 2021, Tobia received a draft letter from Company A to Spok's Board of Directors proposing the acquisition.

10.     The next morning, on August 12, 2021, Tobia called Lee. A few minutes after their call ended, Lee began buying Spok shares, first in her parents' account and then in her own account. Between August 12 and August 16, 2021, Lee purchased 25,000 shares of Spok in her own account for over $187,000 and over 102,000 shares in her parents' account for over $765,000, roughly half the total value of her parents' account at the time.

11.     On August 30, 2021, Company A issued a press release and publicly disclosed that Company A had acquired 6.5% of Spok's outstanding shares and that Company A proposed to acquire the rest of the outstanding shares of Spok's common stock. Spok's stock price increased by approximately 26% on the news.

3

12. Lee sold all the Spok shares in her account on August 31, 2021, and all the Spok shares in her parents' account on September 1, 2021, and reaped a total profit of over $262,000.

13. Lee's unlawful profits from trading on the tips she received from Tobia about PFSWeb and Spok totaled approximately $428,595—$302,628 in her parents' account and $125,967 in her own account.

## VIOLATIONS

14. By virtue of the foregoing conduct and as alleged further herein, Tobia and Lee violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

15. The Commission brings this action pursuant to the authority conferred upon it by Exchange Act Sections 21(d) and 21A [15 U.S.C. §§ 78u(d) and 78u-1].

16. The Commission seeks a final judgment: (a) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (b) ordering Defendants to pay civil money penalties pursuant to Exchange Act Section 21A [15 U.S.C. § 78u-1]; (c) prohibiting Tobia from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and (d) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

17. This Court has jurisdiction over this action pursuant to Exchange Act Section 27 [15 U.S.C. § 78aa].

18. Defendants, directly and indirectly, have made use of the means or instrumentalities

of interstate commerce or of the mails, or of the facilities of a national securities exchange, in connection with the transactions, acts, practices, and courses of business alleged herein.

19. Venue lies in this District under Exchange Act Section 27 [15 U.S.C. § 78aa]. Defendants transacted business in the Southern District of New York, and certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District. For example, Tobia worked out of Company A's offices in New York, New York, where Tobia obtained the relevant material nonpublic information about at least Spok and Sequans.

## DEFENDANTS

20. **Tobia**, age 60, resides (and did reside during the Relevant Period) in New York, New York and is married to Lee's sister. He was the President and Chief Investment Officer of Company A from September 2019 to September 2021, and a member of Company A's Board of Directors from May 2018 to September 2021. Tobia also served on the Board of Company B from July 2017 to September 2021. Before joining Company A, Tobia was a partner with a Commission-registered investment adviser ("Investment Adviser A"), a firm that he co-founded. Tobia left his position at Investment Adviser A upon joining Company A in 2019, but he kept an ownership stake and remained a passive member of the firm. Before forming Investment Adviser A in 2000, Tobia worked at several registered broker-dealer firms and held Series 7, 63, and 24 licenses.

21. **Lee**, age 57, resides in Dumont, New Jersey and is Tobia's sister-in-law. She has been self-employed as a jewelry maker since 2020. Prior to starting her jewelry business, Lee worked in fashion design for various brands from 2000 through 2020, including at a publicly traded company.

## RELEVANT ENTITIES

22. **Company A** is a Delaware corporation headquartered in New York, New York. Company A describes itself as a "value-oriented acquirer of businesses across public and private

5

markets." Company A's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and trades on the NASDAQ.

23. **Company B** is a Delaware corporation headquartered in Chelmsford, Massachusetts. Company B describes itself as a "customer and brand experience company operating in six service categories - data, marketing, sales, customer care, fulfillment and logistics." Company B's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and trades on the NASDAQ exchange.

24. **PFSWeb** is a Delaware corporation headquartered in Irving, Texas. During the Relevant Period, PFSWeb had two primary business units: LiveArea, which provided e-commerce web services, and another called PFS, which provided logistics and order fulfillment services. Before being acquired by GXO Logistics, Inc. in October 2023, PFSWeb's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NASDAQ under the ticker symbol PFSW.

25. **Sequans** is incorporated in France and headquartered in Colombes, France. Sequans designs, develops, and supplies semiconductor chips for use in internet connected devices. Sequans' American Depositary Shares are registered with the Commission pursuant to Section 12(b) of the Exchange Act and trade on the New York Stock Exchange under the ticker symbol SQNS.

26. **Spok** is a Delaware corporation headquartered in Alexandria, Virginia. Spok provides communication services used by hospitals and health systems. Spok's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and trades on the NASDAQ under the ticker symbol SPOK.

# FACTS

## I. BACKGROUND

### A. Tobia And Lee's Relationship

27. Tobia and his wife have been married for over thirty years.

28. Tobia and Lee, his wife's sister, have known each other for over thirty years and have a close family relationship.

29. Over the years, Tobia and his wife have provided financial and other support to Lee, a third sister, and Lee's elderly parents, who are 88 and 84 years old respectively.

30. Since approximately 2013, Lee's primary means of support has been the income from the stocks she owns and the proceeds of stock sales.

31. Most of Lee's stock investments have been based on recommendations or other information she obtained from Tobia, including, as alleged in Section II below, material nonpublic information concerning PFSWeb, Sequans and Spok.

32. During the Relevant Period, Lee knew that Tobia was a high-ranking officer and director at Company A and a director at Company B, and she knew that both were public companies.

33. During the Relevant Period, Lee also understood that Tobia's educational background was in finance, that he had worked at a number of firms in the securities industry, that his work involved analyzing companies and stocks, and that he had cofounded an investment firm.

### B. Tobia's Duties of Confidentiality

34. As an officer and director of Company A, Tobia owed a fiduciary duty to Company A, which included a duty to maintain the confidentiality of material nonpublic information that he obtained through his employment at Company A.

35. In addition, Company A's insider trading policy and Tobia's employment agreement

with Company A contained prohibitions on disclosure of confidential information.

36. The prohibition on disclosing material nonpublic information under Company A's insider trading policy encompassed disclosures to "any outside person (including family members . . .)." The policy also set forth examples of information that is generally considered material, including "news of a pending or proposed joint venture, merger, acquisition, tender offer, divestiture, recapitalization, strategic alliance, licensing arrangement or purchase or sales of substantial assets."

37. Tobia's employment agreement with Company A similarly provided that Tobia agreed not to "reveal, disclose or make known any Confidential Information" including "acquisition plans" and other "strategies."

38. Tobia reviewed and signed the Company A insider trading policy and employment agreement and was aware of the prohibitions they contained.

39. Company A's policies were consistent with Tobia's independent understanding of prohibitions on disclosing material nonpublic information based on his work experience over several years in roles that involved being entrusted with such information.

40. As a director of Company B, Tobia also owed a fiduciary duty to Company B.

41. In at least one instance in his role as a director of Company B, as alleged below, Tobia also owed a duty of confidentiality to PFSWeb with respect to material nonpublic information that Tobia obtained from PFSWeb's Director A.

## II. LEE'S UNLAWFUL TRADING BASED ON TOBIA'S TIPS

### A. PFSWeb

42. In June 2021, Tobia, in his capacity as a director of Company B, contacted PFSWeb's Director A through an introduction by a mutual friend.

43. Both PFSWeb and Company B had operations in the logistics and order

8

fulfillment industry.

44. Tobia told Director A that he wanted to discuss a potential transaction between PFSWeb and Company B.

45. Tobia and Director A spoke for over an hour on June 24, 2021, starting at 10:00 a.m.

46. Director A spoke to Tobia in Director A's capacity as a PFSWeb board member speaking to the director of another company interested in exploring a possible transaction between their respective companies.

47. At the time of his call with Tobia, Director A knew that PFSWeb was in the process of consummating, and was planning to soon announce, the sale of its LiveArea business unit to a company called Merkle.

48. At the time of his call with Tobia, Director A also knew that, once the sale of the LiveArea business unit was complete, PFSWeb intended to pursue a process to find a potential buyer for PFS, PFSWeb's remaining logistics and order fulfillment business unit.

49. During their call, Director A and Tobia agreed to have PFSWeb and Company B sign a written nondisclosure agreement in connection with discussions between the two companies about a potential transaction.

50. During their call, Director A told Tobia that PFSWeb's advisors would be sending him the written nondisclosure agreement.

51. Director A understood and expected that the nonpublic information about PFSWeb and Company B discussed on his call with Tobia was to remain confidential pending execution of the written nondisclosure agreement.

52. Director A also understood that Tobia shared the same understanding and expectation regarding the confidentiality of their conversation.

53. Tobia owed a duty of trust and confidence to PFSWeb with respect to the nonpublic

9

information that Director A disclosed to Tobia on their June 24, 2021 call.

54. With that understanding, on their June 24 call, Director A conveyed to Tobia information from which Tobia learned that (i) PFSWeb's LiveArea business unit would soon be sold; (ii) PFSWeb would soon be announcing the sale of Live Area; and (iii) PFSWeb and Company B could then resume discussions about a potential transaction involving PFSWeb's remaining business unit, PFS.

55. At 11:43 a.m. on June 24, 2021, less than an hour after concluding his call with Director A, Tobia called Lee.

56. Less than fifteen minutes after her call with Tobia ended, at 11:57 a.m. the same day, Lee began buying PFSWeb stock in her parents' brokerage account.

57. Two minutes later, at 11:59 a.m. that day, Lee started buying PFSWeb stock in her own account.

58. Lee continued to buy PFSWeb stock in both her and her parents' accounts over the next several days.

59. In almost every instance, a call with Tobia preceded her PFSWeb stock purchases, often by just minutes before she placed a trade.

60. For example, (i) on June 28, 2021, Lee received a call from Tobia at 1:44 p.m. that lasted almost four minutes, and she then purchased additional shares of PFSWeb in her parents' account, at 1:50 p.m. and 1:54 p.m., and purchased additional PFSWeb shares in her own account at 2:51 p.m.; (ii) on July 1, 2021, Tobia called Lee at 9:03 a.m. and 9:28 a.m., and Lee bought more PFSWeb shares in her account at 10:28 a.m.; and (iii) on July 1, 2021, at 12:27 p.m., Tobia called Lee again, and she bought more PFSWeb shares in her parents' account at 12:28 p.m. and in her own account at 12:51 p.m.

61. In total, Lee purchased over 60,000 shares of PFSWeb in both accounts between

Thursday, June 24, and Friday, July 2, 2021 (approximately 20,000 in Lee's account and 40,000 in her parents' account), at an average price of $7.49 per share and at a total cost of over $455,000 (approximately $156,000 in Lee's account and $299,000 in her parents' account).

62. Before the market opened on the next trading day, Tuesday, July 6, 2021, PFSWeb publicly announced its sale of LiveArea, and the price of PFSWeb stock increased by 43% that day, closing at $10.80 per share, a $3.23 increase from the July 2 closing price of $7.57 per share.

63. Approximately 90 minutes after the announcement, Lee sold all the PFSWeb shares in her account and her parents' account for a total of over $621,000, and reaped a total profit of over $165,000—over $61,000 in her account and over $104,000 in her parents' account.

64. Lee's trades in PFSWeb yielded gains of over 36% on shares that were held for less than two weeks and in some instances for just one business day.

**B.  Sequans**

65. From May 2021 through July 2021, Company A was engaged in discussions with Sequans about Company A's potential acquisition of Sequans.

66. On May 17, 2021, Company A and Sequans executed a written nondisclosure agreement in connection with the discussions.

67. As President and Chief Investment Officer of Company A, Tobia played an integral role in Company A's efforts to acquire Sequans.

68. On July 26, 2021, at 4:25 p.m., Company A sent an email to Sequans' Chairman and Chief Executive Officer attaching a letter to Sequans' Board of Directors. The letter explained: "We are providing this brief summary of our discussions to outline our interest in pursuing a transaction with Sequans and explain why we believe [Company A] is a unique partner for the next chapter of its growth." The letter went on to discuss why Company A considered Sequans an attractive target, and why Company A's capital and other resources would support Sequans' business

11

strategy.

69. Tobia received emails attaching drafts of the letter in the days leading up to its transmission, and Tobia received the final version of the letter by email on July 26, 2021, the same day it was sent to Sequans.

70. On July 27, 2021, at 10:08 a.m., the morning after Company A sent its letter to Sequans, Tobia called Lee and they spoke for approximately two-and-a-half minutes.

71. At 10:17 that morning, approximately seven minutes after Lee had concluded her call with Tobia, she began purchasing shares of Sequans in her parents' account.

72. Over approximately the next hour, Lee made several purchases of Sequans shares in her own account.

73. In total that morning, Lee purchased 80,000 shares of Sequans in both accounts (30,000 in her account and 50,000 in her parents' account), at an average price of $5.00 per share and at a total cost of approximately $400,000 (approximately $152,000 in her account and $248,000 in her parents' account).

74. Company A did not ultimately reach an agreement to acquire Sequans, and there was no public announcement about the companies' discussions regarding a potential acquisition. As a result, Lee did not profit from owning or selling shares of Sequans based on the information she had obtained from Tobia.

**C.    Spok**

75. By August 2021, Company A had already acquired a substantial position in Spok and was taking steps to prepare for a bid to purchase the entire company.

76. That month, Tobia was involved in discussions at Company A about making an offer to acquire Spok.

77. On August 11, 2021, Tobia (and others at Company A) received a draft of a

12

confidential letter to be sent by Company A to Spok's Board of Directors communicating Company A's offer to acquire all the outstanding shares of Spok at a premium to the market price.

78. The next morning, on August 12, 2021, at 8:42 a.m., Lee texted Tobia, "Can u advise a stock that pays a nice dividend?"

79. Tobia responded by texting "No," and a few minutes later texted, "I have another name" and "Will call."

80. At 11:05 a.m. that morning, Tobia called Lee, and their call lasted 96 seconds.

81. Almost immediately after the call concluded, at 11:09 a.m., Lee began purchasing shares of Spok stock in her parents' account and began purchasing Spok shares in her own account a few minutes later at 11:11 a.m.

82. That afternoon, at 1:28 p.m., Tobia called Lee, and Lee then called Tobia back three minutes later at 1:31 p.m.

83. Between 1:31 p.m. and 1:47 p.m. that afternoon, Lee made additional purchases of Spok shares in her parents' account.

84. A few days later, on August 16, 2021, as Tobia continued to participate in planning for Company A's offer to acquire Spok, Tobia again communicated with Lee by phone and text, and she made additional purchases of Spok shares that day after they communicated.

85. At 10:47 a.m. that day, Tobia texted Lee, "Are you there[ ]."

86. At 10:49 a.m., Lee responded, "I'm in city today," and Tobia wrote back, "Ok I will call you later."

87. At 11:21 a.m. that morning, Tobia called Lee, and their call lasted 69 seconds.

88. About three minutes later, at 11:25 a.m., Lee purchased additional shares of Spok in her parents' account and then purchased Spok shares in her own account at 11:32 a.m.

89. In total, Lee purchased 25,000 shares of Spok in her own account and over 102,000

shares in her parents' account between August 12 and August 16, 2021, at an average price per share of $7.51.

90. The total cost for the purchases of Spok in Lee's account was over $187,000, and the total cost for the purchases of Spok in her parents' account was over $765,000, an amount that represented approximately half the total value of her parents' account.

91. On August 30, 2021, after the market closed, Company A issued a press release and publicly filed a Form 13D with the Commission disclosing that Company A had acquired 6.5% of Spok's outstanding shares and that it proposed to acquire the remaining outstanding shares of Spok's common stock at a price of $10.75 per share.

92. Spok's stock price increased by 26% following Company A's announcement, from a closing price of $7.85 per share on August 30 to a closing price of $9.91 per share on August 31.

93. Lee sold all the Spok shares in her account on August 31, 2021, and all the Spok shares in her parents' account on September 1, 2021, at an average price of $9.57 per share.

94. Lee's sales of Spok shares in her account generated proceeds of over $252,000, for a profit of over $64,000, and her sales of Spok shares in her parents' account generated proceeds of over $963,000, for a profit of over $198,000.

95. Across the two accounts, Lee realized trading profits of over $262,000 on her Spok purchases, a 27% return on an investment of approximately $953,000 in about three weeks.

## FIRST CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### (Both Defendants)

96. The Commission realleges and incorporates by reference here the allegations in paragraphs 1 through 95.

97. Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or

14

the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

98. By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining Defendants and their agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### II.

Ordering Defendants to pay civil monetary penalties pursuant to Exchange Act Section 21A [15 U.S.C. § 78u-1];

### III.

Prohibiting Tobia from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and

**IV.**

Granting any other and further relief this Court may deem just and proper.

Dated: New York, New York
January 13, 2025

/s/ *Antonia M. Apps*
_____
ANTONIA M. APPS
REGIONAL DIRECTOR
Tejal D. Shah
George N. Stepaniuk
Oren Gleich
Mariel Bronen
Kiran Patel
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street
Suite 20-100
New York, NY 10004-2616
212-336-0190 (Gleich)
GleichOr@sec.gov